# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

ANTHONY D. McCORMICK,

        Plaintiff,

vs.

CAROLYN W. COLVIN, Commissioner
of Social Security,

        Defendant.

No. C12-4061-MWB

**REPORT AND
RECOMMENDATION**

―――――――――――

      Plaintiff Anthony D. McCormick seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* ("Act"). McCormick contends that the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that he was not disabled. For the reasons that follow, I recommend that the Commissioner's decision be reversed and that this case be remanded for further consideration and findings.

## *Background*

      McCormick was born in 1977 and was 32 years old on his alleged onset date of December 28, 2009. AR 12, 120. He has a high school diploma and past relevant work as a machinist and welder. AR 37-39, 120, 245-46. He protectively filed his application for DIB on January 14, 2010. AR 120-26. The application was denied initially and on reconsideration. AR 61, 71. McCormick then requested a hearing, which was conducted April 13, 2011, by Administrative Law Judge ("ALJ") Jan E.

Dutton.   AR 12, 29.   During the hearing, McCormick and his wife, Sally McCormick, testified, as did a vocational expert ("VE").   AR 31-54.   The ALJ issued a decision denying McCormick's application on April 19, 2011.   AR 12-23.   On April 18, 2012, the Appeals Council denied McCormick's request for review.   AR 1-5.   As such, the ALJ's decision is the final decision of the Commissioner.   AR 1; *see also* 20 C.F.R. § 404.981.

On June 18, 2012, McCormick commenced an action in this court seeking review of the ALJ's decision.   This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case.   The parties have briefed the issues and the matter is now fully submitted.

## Summary of Evidence

This case involves physical and mental impairments.   Specifically, the ALJ found that McCormick has the following severe impairments:   fibromyalgia, degenerative disc disease of the lumbar spine; facet arthropathy at L4 to L5 and L5 to Sl; low back pain, major depressive disorder, recurrent, moderate, depressive disorder due to general medical condition; and generalized anxiety disorder.   AR 14-15.   I have reviewed the entire record and will summarize the evidence relevant to the issues McCormick has raised.

### A.   *Medical Evidence*

In May 2008, McCormick saw Michael P. Luft, D.O., a general practitioner, complaining of pain in his legs, arms and abdomen.   AR 338-39.   Dr. Luft assessed chronic abdominal pain, chronic lower back pain, asthma, irritable bowel syndrome, depression and generalized anxiety disorder.   AR 339.   He prescribed Lyrica for depression and anxiety, refilled McCormick's other medications, and told him to follow up in four months.   *Id.*

McCormick returned to Dr. Luft's office in September 2008 with a head cold and severe back pain. AR 336-37. He reported that his back pain and radiculopathy affected both legs. AR 336. On examination, his lumbosacral spine exhibited no tenderness to palpation or muscle spasms and straight-leg raises were negative. AR 337. The doctor recommended that McCormick consult with an orthopedist. *Id.*

In November 2008, McCormick had an MRI scan of the lumbar spine. The scan showed mild facet hypertrophy from L3 through S1, but otherwise all vertebrae and discs were intact. AR 283. The MRI showed no evidence of pathology to account for McCormick's symptoms, nor did it reveal any appreciable change since an MRI scan taken in 2002. *Id.* A bone scan conducted in November 2008 also revealed no significant abnormality. AR 284.

In April 2009, McCormick saw Dr. Luft again and reported both lower back pain and burning on urination. AR 320. His back and musculoskeletal examinations were normal. AR 321. Dr. Luft prescribed a medication to treat hemorrhoids. *Id.*

In October 2009, McCormick returned to Dr. Luft complaining of back pain. AR 317. On examination, he had difficulty bending at the waist secondary to pain and stiffness. *Id.* Dr. Luft diagnosed chronic low back pain and neuropathy. *Id.*

McCormick saw a physiatrist, Michael McHenry, M.D., in November 2009, complaining of lower back pain. AR 285-86. He reported an eight-year history of back pain and increased pain when performing manual labor at work. AR 285. He was alert and oriented and his manual motor testing was five out of five. *Id.* His gait was normal but he had decreased lumbar range of motion. *Id.* Dr. McHenry assessed chronic low back pain, lumbar facet syndrome and lumbar spondylosis at L4-5 and L5-S1. AR 285-86. He recommended a lumbar facet injection. AR 286.

In January 2010, McCormick went to the emergency room complaining of depression. AR 287. He expressed concern about losing his job but adamantly denied

any thought or plan to harm himself. *Id.* The emergency room physician discharged him in "good condition" with a referral to a crisis therapist. AR 288. McCormick then visited a social worker for a crisis assessment that same day. AR 297. He reported feelings of anger, guilt, anxiety and isolation. *Id.* His mood was anxious and depressed. *Id.* He stated that he went to the emergency room because he had severe physical pain and increased symptoms of depression. *Id.* He indicated that he might be addicted to hydrocodone. AR 298. On examination, McCormick's judgment was good and he was logical and organized. *Id.* His insight and memory were normal. *Id.* The social worker recommended therapy and scheduled an appointment the next day. *Id.* However, McCormick cancelled his next two appointments due to weather and a sick child. AR 299-300.

McCormick saw Dr. Luft again on January 12, 2010. AR 314. He complained of pain "all over" and in his joints. *Id.* On examination, he had tenderness to palpation in his forearms, thighs, and calves. *Id.* Dr. Luft observed decreased range of motion secondary to stiffness and pain, but a back examination was normal. *Id.* McCormick's mental status was also found to be normal. *Id.* Dr. Luft ordered a rheumatoid panel and stated that if it was normal, then he believed McCormick had fibromyalgia exacerbated by depression and anxiety. AR 315.

McCormick saw Ejiro Vivian Agboro-Idahosa, M.D., for a psychiatric medical evaluation on January 27, 2010. AR 301-03. McCormick reported that he was unmotivated and self-isolative, that he experienced panic attacks and that he had problems sleeping. AR 301. He also stated that he was recently fired from his job because he could not perform tasks required of the job. *Id.* He acknowledged a history of marijuana use and stated that he drank alcohol occasionally. AR 302. On examination, McCormick's mood was depressed but he denied suicidal ideation. *Id.* Dr. Agboro-Idahosa noted that McCormick's judgment was fair and that he was alert and

oriented. *Id.* She also found McCormick's thought process to be logical and goal directed. *Id.* Dr. Agboro-Idahosa diagnosed generalized anxiety disorder and fibromyalgia. AR 302-03. She assigned a global assessment of functioning ("GAF") score of 50. AR 303. She prescribed anti-depressant and anti-anxiety medications and told McCormick to follow up in two weeks. *Id.*

Dr. Agboro-Idahosa completed a mental capacities evaluation concerning McCormick on the same day, after seeing him for the first time. AR 293-94. She wrote that McCormick suffered from major depression, depressive disorder due to general medical condition and generalized anxiety. AR 294. She found that McCormick was mildly limited in activities of daily living and markedly limited in his ability to maintain concentration, persistence, or pace. *Id.* She stated that he had "extreme" difficulties in maintaining social functioning and that he would miss more than four unscheduled days of work each month. *Id.*

Dr. Luft completed a functional capacity questionnaire (physical) on January 27, 2010. AR 293. He reported that McCormick had low back pain, depression, anxiety, and fibromyalgia. *Id.* He found that McCormick could stand and walk no more than two hours per day and sit no more than four hours in an eight-hour workday. *Id.* He also found that McCormick could never lift over ten pounds. *Id.* Dr. Luft indicated McCormick would be absent more than four days per month due to his impairments, and his pain was severe enough to interfere with the attention and concentration needed to perform even simple work tasks. *Id.*

McCormick attended a counseling session with a social worker in January 2010. AR 304. He stated that he was encouraged by his visit with Dr. Agboro-Idahosa and the medications she prescribed. *Id.* The social worker addressed plaintiff's financial concerns and recommended programs he could pursue. *Id.* She noted that his mood was pleasant and his affect congruent to his mood. *Id.* McCormick agreed with the

social worker that weekly visits were necessary, but he cancelled his next appointment and did not return for additional counseling.   AR 304, 306.

McCormick saw Dr. Agboro-Idahosa again in February 2010, reporting that he felt "a lot better" and had been taking his medications regularly.   AR 307.   Dr. Agboro-Idahosa assigned a GAF score of 55, denoting only moderate symptoms.   AR 308.   She refilled McCormick's medications and told him to follow up in three months. *Id.*   However, McCormick missed his follow up appointment.   AR 394.

McCormick saw Dr. Luft in February 2010, with his chief complaint being: "Burn injury. On back."   AR 311.   Musculoskeletal and back examinations were normal, as was McCormick's mental status.   *Id.*   Dr. Luft prescribed Savella, a drug used to treat fibromyalgia.   *Id.*

In March 2010, McCormick saw Dr. Luft for review of his medications.   AR 346.   A musculoskeletal examination revealed multiple tender points throughout the upper torso, low back, legs and neck.   *Id.*   McCormick's mental status was again normal.   *Id.*   Dr. Luft diagnosed chronic low back pain and fibromyalgia.   *Id.*   He refilled plaintiff's medications, prescribing Lortab for pain rather than Tramadol, and told him to return in one month.   AR 346-47.

Dr. Luft completed a medical source statement on March 15, 2010.   AR 354-58.   He reported that McCormick had chronic back pain and anxiety.   AR 354.   He stated that McCormick's pain symptoms would constantly interfere with his attention and concentration to perform work tasks.   AR 355.   He indicated that McCormick was incapable of even a low stress job.   *Id.*   He opined that McCormick could sit for no more than fifteen minutes and stand for no more than thirty minutes at a time.   AR 356.   He further stated that McCormick could sit for two hours and stand/walk for four hours in an eight-hour work day.   *Id.*

A state agency medical consultant, Matthew Byrnes, D.O., completed a physical RFC assessment in March 2010. AR 359-66. Dr. Barnes found that McCormick's self-reported limitations were not substantiated by examinations or imaging. AR 366. He opined that McCormick had physical limitations consistent with the ability to perform light work. AR 360-63. These conclusions were later affirmed as written on June 7, 2010, by another state agency medical consultant, John May, M.D., based on his review of the record evidence. AR 388.

A state agency psychological consultant, Aaron Quinn, Ph.D., completed a psychiatric review technique form and a mental RFC assessment in March 2010. AR 367-84. He found that McCormick had mild restriction in activities of daily living and moderate difficulties in (a) maintaining social functioning and (b) maintaining concentration, persistence or pace. AR 377. He further noted that McCormick experienced no episodes of decompensation. *Id.* In his narrative discussion, Dr. Quinn opined that McCormick retained the ability to complete at least simple, repetitive tasks on a sustained basis. AR 383. Dr. Quinn's conclusions were later affirmed as written on June 7, 2010, by another state agency psychological consultant, Myrna Tashner, Ed.D., based on her review of the record evidence. AR 389.

McCormick returned to Dr. Luft in July and October 2010 to review his medications and to receive treatment of a sore throat. AR 400-05. In March 2011, McCormick saw a nurse practitioner at Dr. Luft's office with a complaint of sinus pressure and was found to have sinus and throat infections. AR 428-29.

In April 2011, McCormick saw Dr. Luft for a checkup and medication renewal. AR 425. His musculoskeletal examination revealed overall muscle weakness and chronic pain in the legs and lower back. *Id.* He had decreased range of motion in his lower back secondary to pain. *Id.* Dr. Luft listed diagnoses of chronic pain syndrome, fibromyalgia, neuropathy, polymyalgia and anxiety depression. AR 426.

*B.*     *Other Evidence*

*1.*     *Claimant's Testimony and Function Report*

In a function report dated March 2010, McCormick reported that he cared for his children during the day, helping them get ready for school, picking them up from the bus stop in the afternoon and preparing them for bed in the evening.   AR 172.   He sometimes helped prepare supper and could make simple meals, such as sandwiches, frozen pizza and cereal.   AR 172, 174.   He also did laundry, minor household repairs and shopped for groceries with his wife.   AR 174-75.   He reported that he was able to drive a car and that he went outside at least five times a week.   AR 175.   He could pay bills, count change and handle a savings account and check book.   *Id.*   He stated that his hobbies included fishing, hunting, watching movies and playing with his children, although he reported he could do those activities for only short periods of time.   AR 176.

McCormick indicated that he had no problems with personal care.   AR 173. However, he did report problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, using his hands and getting along with others. AR 177.   He also reported problems with his memory and concentration.   *Id.*   He stated that he had no problems with his attention, understanding and following instructions.   *Id.*   He indicated that he could follow written and spoken instructions.   *Id.*   He reported no problems with changes in routine or authority figures.   AR 178.

At the hearing, McCormick testified that on a typical day, he sent his kids off to school, did laundry, washed dishes and cleaned the house.   AR 43.   He also testified that although it was difficult, he tried to exercise, including walking through his house, doing leg raises, straightening his back against the wall and lifting his arms over head. AR 43-44.   He testified he experienced back pain and shooting pain through his legs and

8

arms.   AR 35.   He stated that he had tried multiple treatments but did not feel like he made any progress with treatment.   AR 42.

McCormick testified that he did not go to therapy because he could not afford it. AR 45.   He took his medications as prescribed and experienced no side effects.   AR 42.   He did not have any hospitalizations associated with his alleged disability.   AR 40.   He estimated that he could sit for ten minutes.   AR 46.   He also testified that he quit his last job because he could not handle the physical aspects of it or the stress.   AR 39.   He stated that social interactions were not a problem for him and that he could "get along with people great."   AR 53.

### 2.    *Spouse's Testimony*

Sally McCormick provided testimony that was consistent with her husband's. AR 46-49.   For example:

> And I'm the one that comes home every day, and I see the days where he can't get out of bed, where I can't leave him alone with the kids, because, you know, he's taken his medicine, and he is tired, and I've got to make sure that everybody's okay and getting what they're supposed to. I mean, yeah, he does get up in the morning, he does put them on the bus, and he does try to help around the house. But, you know, doing a load of laundry a day, or doing the dishes once a day, is far from what it takes to have any kind of job. He can't sit still. He's either got to sit for so long, 20 minutes, 30 minutes; then, he's got to get up and move. I've seen him lay on the floor and cry because it hurts that bad. We have been to I couldn't tell you how many doctors, I can't even remember all the doctors, because we were trying to find an answer, because we wanted it to be something that could be fixed. We've been to Mayo Clinic. Like I said, that's why they took out his gallbladder, that's why they did the GERD surgery. They were trying to find -- you know, to see what the cause was, and trying to fix it. And none of those ever worked. So, it's just been an ongoing battle.

AR 47.   She also testified that private health insurance covered part of the cost of McCormick's counseling.   AR 48.

### 3. *Work Performance Assessment*

McCormick worked as a welder for approximately two months in 2010, after his alleged onset date. AR 219. His former employer reported that both the quality and quantity of his work were sufficient to satisfy demands. *Id.* The employer also responded positively to a series of specific questions concerning McCormick's capabilities and performance and indicated that he was eligible for rehire on a full-time basis. AR 220-22. Finally, the employer indicated that there were no special considerations made during McCormick's employment. AR 222.

### 4. *Vocational Expert's Testimony*

The VE found McCormick to have past relevant work as a machinist (a skilled position with an SVP[1] of 7) and a welder-assembler (a skilled position with an SVP of 6). AR 245-46. During the hearing, the VE gave the following answers to hypothetical questions posed by the ALJ:

> Q. We have a younger worker, high school education. You've identified two jobs as past work. Do you need to make any changes to that document?
>
> A. No, Your Honor.
>
> Q. Thank you. First question is for unskilled light work. Assume an individual, younger, high school education, who could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds. No restriction in stand, sit, or walk. Could do all of those at least six hours in an eight-hour day. Could occasionally do postural activities: climb, balance, stoop, kneel, crouch, crawl. Should not work on ladders or with

---

[1] "SVP" refers to Specific Vocational Preparation, defined in Appendix C of the *Dictionary of Occupational Titles* as being "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." A position with an SVP of 7 requires vocational preparation of two to four years, while a position with an SVP of 6 requires vocational preparation of one to two years. *See Dictionary of Occupational Titles,* Appendix C.

hazards such as dangerous machinery. Then, from a mental standpoint, unskilled work, routine, repetitive, SVP: 1 or 2, that doesn't require extended concentration or attention. With that functional capacity, I realize the claimant could not go back to past work. Would you identify any unskilled light or sedentary work that would be appropriate?

A.      Well, under that hypothetical, Your Honor, there would be a fairly wide range of, of sedentary and light work that could be done. There would be receptionist type work. A sample DOT number is 237.362-014. In the state of Iowa, there would be about 900 in the sedentary exertional category, and about the same number in the light; and nationally, there'd be about 84,000 in each of those categories.  Also, there would be production work. A sample DOT number is 713.687-026. In the state of Iowa, there'd be about 300 in sedentary; and in the light, there'd be about 25,000. There would also be cashiering type work. A sample DOT number is 211.462-010. In the light exertional category, in Iowa, there'd be about 11,000; nationally, about 1,114,000.

Q.      If you'd go back to production, I don't think you gave me the numbers for national.

A.      Nationally, in the, in the sedentary, there'd be about 28,200; and, and nationally, in the light, there'd be about 220,000.

Q.      If you would consider the full range of unskilled light and sedentary work with, with this hypothetical, what percentage do you feel would be retained?

A.      I think, probably, about 80 percent.

Q.      At both exertion levels?

A.      Probably more in the sedentary, less in the light.

AR 50-51.   McCormick then asked the VE a follow-up question:

Q.      Other than, well, that looks good on paper.   I mean, on a good day, I may be able to do that; but what happens in that job when, you know, I don't have a good day, and I call in, and I keep calling in?   What happens then?

11

A.　　I think, if that were to happen, you'd lose your job.

AR 52.

### Summary of ALJ's Decision

The ALJ made the following findings:

(1)　　The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2)　　The claimant has not engaged in substantial gainful activity since December 28, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

(3)　　The claimant has the following severe impairments: fibromyalgia; degenerative disc disease of the lumbar spine; facet arthropathy at L4 to L5 and L5 to S1; low back pain. Mental-- major depressive disorder, recurrent, moderate, depressive disorder due to general medical condition; and generalized anxiety disorder (20 CFR 404.1520(c)).

(4)　　The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5)　　After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift twenty pounds occasionally and ten pounds frequently.　He is able to sit, stand or walk, each, for up to six hours in an eight-hour workday.　He is able to perform work that does not require more than occasional climbing, stooping, balancing, kneeling, crouching, kneeling or crawling. He is able to work in an environment that is free from exposure to working on ladders or with hazards such as dangerous machinery.　Due to his severe mental

impairments, he is able to perform routine and repetitive, unskilled work (SVP 1 or 2) that does not require periods of extended concentration or attention.

(6) Step 4 – past work. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

(7) The claimant was born on June 28, 1977 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from December 28, 2009, through the date of this decision (20 CFR 404.1520(g)).

AR 14-23. In finding that McCormick had not engaged in substantial gainful activity since December 28, 2009, the ALJ determined that his brief employment as a welder in 2010 was "an unsuccessful work attempt" that "ended due to his disabling conditions." AR 14.

The ALJ also found that McCormick's impairments, whether considered separately or in combination, do not meet or medically equal any listed impairment.

With regard to mental impairments, she referenced listings 12.04 and 12.06 and expressly found that neither the "paragraph B" nor "paragraph C" criteria were satisfied.   AR 15-16.

In determining McCormick's residual functional capacity ("RFC"), the ALJ addressed McCormick's own statements about the intensity, persistence and limiting effects of his symptoms and found that they were not fully credible.   AR 18.   The ALJ acknowledged that McCormick's physical impairments cause "some discomfort" but found that his "allegations of limitations and pain level that precludes all types of work are inconsistent with the objective medical evidence, the absence of more aggressive treatment, medical opinions, and the evidence as a whole."   *Id.*   In particular, the ALJ stressed the lack of objective findings in the medical evidence that could explain McCormick's allegations of disabling pain.   *Id.*   For example, his most-recent MRI scan was largely normal and examinations have revealed no other physical condition that could cause the claimed level of pain.   AR 18-20.   Likewise, with regard to mental impairments, the ALJ recognized that McCormick's "mental state affects his ability to perform basic mental activities as required for work" but found that "a psychological condition that would preclude work is not substantiated by the medical evidence."   AR 20.

In assessing medical opinions, the ALJ discredited the opinions of McCormick's treating physician, Dr. Luft.   Dr. Luft provided two separate written statements describing severe limitations.   AR 293, 354-56.   However, the ALJ found that neither the frequency of treatment nor the objective evidence supported those opinions.   AR 19.

The ALJ also afforded little weight to an opinion submitted by Dr. Agboro-Idahosa concerning McCormick's mental impairments.   The ALJ noted that the opinion had been issued after a single evaluation and found that it was unsupported by other substantial medical evidence.   *Id.*

The ALJ also discounted the testimony of McCormick's wife, finding it was entitled to little weight due to the spousal relationship and the "natural concern and devotion" that one spouse has for the other.  AR 21.  The ALJ also explained that the same factors that caused her to give little weight to McCormick's testimony also applied to his wife's testimony.  *Id.*

As noted above, the ALJ's primary, stated reason for giving little weight to all of these medical and non-medical statements was her conclusion that the objective findings in the medical evidence fail to support the proposition that McCormick's impairments are disabling.  However, she also referenced McCormick's brief employment as a welder in 2010, noting that the employer's work performance assessment was positive despite the fact that the position required "a significantly higher level of function than [McCormick] and his providers have alleged."  AR 21.  Because this period of work began just two months after Dr. Luft and Dr. Agboro-Idahosa submitted their medical opinions, the ALJ concluded that this evidence "further lessens the value of both."  *Id.*

After determining McCormick's RFC, the ALJ found that he is unable to perform any past relevant work.  *Id.*  Based on the VE's testimony, however, she found that he is able to perform "a fairly wide range of light and sedentary work," including such positions as production worker and cashier.  AR 22-23.  As such, she concluded that he is not disabled within the meaning of the Act.  AR 23.

## *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905.  A claimant has a disability when the claimant is "not

only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at

step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a

claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### *The Substantial Evidence Standard*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence

and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's

decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## *Discussion*

McCormick raises the following issues:

I.     The ALJ Erred As A Matter Of Law In Failing To Apply The Treating Physician Standard To The Opinions Of The Treating Physician, Dr. Michael P. Luft.

II.    The ALJ Failed To Give Good Reasons For Failing To Give Great Weight To The Opinions Of The Treating Physician, Dr. Michael Luft.

III.   The ALJ Failed To Properly Evaluate The Opinions Of Examining Psychiatrist Dr. Ejiro Agboro-Idahosa.

IV.    The ALJ Failed To Fully And Fairly Develop The Medical Evidence By Failing To Obtain Work-Related Limitations From A Treating Or Examining Medical Source.

V.     The ALJ's Residual Functional Capacity Assessment And Hypothetical Question Do Not Precisely Set Forth The Claimant's Credible Mental Limitations.

VI.    The ALJ Failed To Properly Consider Mr. McCormick's Subjective Allegations Under The *Polaski* Standard.

*See* Doc. No. 9.

### 1.    Dr. Luft's Opinions

The Commissioner does not dispute Dr. Luft's status as a treating source.    Doc. No. 10 at 23.    That status has significance:

> Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 404.1527(d)(2) [emphasis added].[2]   What this means is that a treating physician's opinion is generally given controlling weight, but is not inherently entitled to it.   *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).   A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).   But that opinion will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.   *Hacker*, 459 F.3d at 937.   The ALJ must "always give

---

[2] Section 404.1527 has been amended, with certain paragraphs being re-numbered.   All citations to that section in this ruling are to the version in effect during the relevant period of time.

good reasons" for the weight given to a treating physician's evaluation. 20 C.F.R §
404.1527(d)(2); *see also Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

When a treating physician's opinion is entitled to controlling weight, the ALJ
must defer to the physician's medical opinions about the nature and severity of an
applicant's impairments, including symptoms, diagnosis and prognosis, what an
applicant is capable of doing despite the impairment, and the resulting restrictions. 20
C.F.R. § 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005).
However, a treating physician's conclusion that an applicant is "disabled" or "unable to
work" addresses an issue that is reserved for the Commissioner and therefore is not a
"medical opinion" that must be given controlling weight. *Ellis*, 392 F.3d at 994.

Here, McCormick argues that the ALJ failed to apply the correct standard.
Indeed, as a threshold matter he complains that the ALJ did not even articulate the
treating physician standard in discussing the weight she decided to afford to Dr. Luft's
opinions. McCormick argues that this violates the Act, which states:

> Any such decision by the Commissioner of Social Security which involves
> a determination of disability and which is in whole or in part unfavorable to
> such individual shall contain a statement of the case, in understandable
> language, setting forth a discussion of the evidence, and stating the
> Commissioner's determination and the reason or reasons upon which it is
> based.

42 U.S.C. § 405(b)(1). I reject this argument. At the beginning of her RFC analysis,
the ALJ stated:

> The undersigned has also considered opinion evidence in accordance with
> the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and
> 06-3p.

AR 17. Section 404.1527 is, of course, the "treating source" regulation quoted above.
After making this initial statement, the ALJ described Dr. Luft's opinions and his history
of treating McCormick. AR 19. She then discussed various factors that caused her to

22

devalue Dr. Luft's opinions.    AR 21.    I will address the merits of those factors below. At this point, I simply disagree with McCormick that the ALJ's discussion of the medical evidence violated the Act's requirement of a statement of "the reason or reasons upon which [the decision] is based."

As for the merits, it is clear that the ALJ gave little (if any) weight to Dr. Luft's opinions.    AR 21.    Those opinions, issued in January and March 2010, included the following:

  a. McCormick could stand and walk no more than two hours per day and sit no more than four hours in an eight-hour workday.

  b. McCormick could sit for no more than fifteen minutes and stand for no more than thirty minutes at a time.

  c. McCormick could never lift over ten pounds.

  d. McCormick would be absent more than four days per month due to his impairments, and his pain was severe enough to interfere with the attention and concentration needed to perform even simple work tasks.

AR 293, 354-56.    The ALJ determined, however, that McCormick could lift twenty pounds occasionally and ten pounds frequently.    She also found that he could sit, stand or walk – each – for up to six hours in an eight-hour workday.    AR 16.    In addition, she found that McCormick could muster the attention and concentration to perform unskilled, repetitive work.    AR 17.    Her RFC finding included no limitations related to work absences.    *Id.*    In short, in virtually every key respect, the ALJ's RFC determination is contrary to the opinions of Dr. Luft, a treating source.

That does not necessarily mean the RFC determination is not supported by substantial evidence.    It does, however, mean the ALJ had the burden of explaining why she did not give controlling weight to Dr. Luft's opinions.    20 C.F.R. § 404.1527(d)(2).    In particular, this requires an explanation of why those opinions either

(a) are not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or (b) are "inconsistent with the other substantial evidence in [the] case record." *Id.* It also means that if the opinions were not entitled to controlling weight, the ALJ was required to give "good reasons" for the weight she gave them. *Id.*

The ALJ could have been far clearer in presenting the analysis. For example, it would have been helpful if she would have included a specific discussion of the treating source standard and explained why Dr. Luft's opinions are not entitled to controlling weight under that standard. Nonetheless, she did make several observations suggesting that she found Dr. Luft's opinions to be inconsistent with other substantial evidence in the record. If those observations were accurate, they could suffice to support the ALJ's decision to give little or no weight to Dr. Luft's opinions. Based on my review of the record, however, I have serious concerns that the ALJ misunderstood, or misinterpreted, the medical evidence.

Most troubling is this paragraph:

The most recent medical evidence in record from Dr. Luft does not serve to lend further credibility to his original opinion nor does it signify any substantial change in the claimant's conditions. The claimant saw him in March 2011, at which time he complained of no recurring symptoms, only that of a sinus infection, and, in April 2010 Dr. Luft reiterated the claimant's previous symptoms and also added neuropathy to his diagnoses, though there are no findings related to such a condition. (Exhibits 18F, 22F)

AR 20. On its face, this paragraph would seem to be all but case-dispositive. After all, despite providing two very-restrictive opinions concerning McCormick's capabilities in 2010, did Dr. Luft examine him again in March 2011 and find nothing wrong other than a sinus infection?

Actually, no. McCormick did not see Dr. Luft in March 2011. Instead, he saw a nurse practitioner on March 17, 2011, and complained of "sinus pressure." AR 428.

That visit resulted in diagnoses of acute sinusitis and acute pharyngitis, along with a prescription for Zpak.   AR 428-29.   In other words, McCormick had a throat and sinus infection and was prescribed antibiotics.   Somehow the ALJ converted this routine, late-winter visit to a nurse practitioner into an examination by *Dr. Luft* evidencing the miraculous disappearance of all of McCormick's other symptoms and impairments.

In fact, Dr. Luft saw McCormick just a few weeks later, on April 5, 2011, for a check-up and medication review.   AR 425.   The notes of that visit indicate that McCormick was still suffering from "[a]bnormal and overall muscle weakness and chronic pain especially to legs and lower back."   *Id.*   Dr. Luft's treatment notes further state that he found "[a]bnormal and decrease [range of motion] to low back secondary to pain and stiffness, decrease strength to legs 2/5 to flexion and extension." *Id.*   Dr. Luft listed the following diagnoses:   chronic pain syndrome, fibromyalgia, neuropathy, polymyalgia and anxiety depression."   AR 426.[3]

Thus, not only did the ALJ completely misconstrue a nurse practitioner visit in March 2011, she entirely discounted an actual examination by Dr. Luft a few weeks later that resulted in findings consistent with Dr. Luft's previously-issued medical opinions. Moreover, while the ALJ was critical of Dr. Luft for adding neuropathy as a new diagnosis after this examination, his treatment notes show that he added it based on his review of records from "Iowa City Hospitals" which indicated that McCormick was diagnosed with possible Guillian-Barre syndrome at age 2.[4]   AR 426.   The ALJ's

---

[3] This is apparently the treatment note the ALJ referenced as being from "April 2010" in the paragraph I quoted above.   In fact, the examination took place in April 2011.   AR 425-26.
[4] Guillian-Barre syndrome is a form of neuropathy.   *See* Peripheral Neuropathy Fact Sheet: http://www.ninds.nih.gov/disorders/peripheralneuropathy/detail_peripheralneuropathy.htm (last viewed July 18, 2013).

not-so-subtle suggestion that Dr. Luft created the new diagnosis out of thin air is another misinterpretation of his records.

These are not the only reasons the ALJ provided for giving virtually no weight to Dr. Luft's opinions, but some of the other ones are not much better. She pointed to a "significant gap in treatment," which turns out to be a six-month period of time in 2009 that occurred *before* McCormick's alleged onset date. AR 12, 18. She did not explain why a "gap" of that length at a time when McCormick does not claim to have been disabled somehow detracts from Dr. Luft's opinions.

The ALJ also discussed the lack of objective medical evidence supporting Dr. Luft's opinions. AR 18. Again, however, this is misleading. The ALJ found that McCormick suffers from fibromyalgia and that it is a severe impairment. AR 14. Dr. Luft's opinion from March 2010 noted the presence of multiple tender points, nonrestorative sleep, chronic fatigue, and muscle weakness. AR 354. These reports are consistent with Dr. Luft's treatment records. AR 346, 397. Fibromyalgia is clinically diagnosed through a musculoskeletal examination, by which patients qualify for the classification of fibromyalgia by the presence of pain in 11 of 18 tender points located throughout the body. *See* Frederick Wolfe et al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee,* 33 Arthritis and Rheumatism 160 (1990).[5]

The Eighth Circuit has held that "trigger-point test findings consistent with fibromyalgia constitute objective evidence of the disease." *Chronister v. Baptist Health*, 442 F.3d 648, 656 (8th Cir. 2006) (citing *Johnson v. Metro. Life Ins. Co.*, 437 F.3d 809 (8th Cir. 2006)); *accord Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003). Fibromyalgia often leads to sleep derangement, contributing to a general cycle

---

[5] The American College of Rheumatology's 1990 criteria may be used to establish a diagnosis of fibromyalgia. *See* Social Security Rule 12-2p (July 25, 2012).

of daytime fatigue and pain.  *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

It is usually diagnosed only after eliminating other conditions.  *See, e.g., Forehand v. Barnhart,* 364 F.3d 984, 987 (8th Cir. 2004).  Because it is a rheumatic disease, it is not diagnosed through the type of objective findings utilized with neurological or orthopedic disorders.  *See, e.g., Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

In short, the fact that McCormick had relatively-normal MRI findings and lacked other objective findings that would suggest neurologic or orthopedic impairments does not provide a good reason for discounting Dr. Luft's opinions.

The ALJ also referenced McCormick's brief, post-onset employment as a welder. She noted that he was able to perform that job satisfactorily for six weeks in 2010 even though the position required a high level of exertion.  AR 21.  She concluded that this is inconsistent with Dr. Luft's opinions concerning McCormick's capabilities.  *Id.* That is a fair observation.

McCormick argues, however, that using this brief period of employment to deny his application violates the Commissioner's rules.  Specifically, he contends that the employment was an "unsuccessful work attempt," as defined by 20 C.F.R. § 404.1574(c)(3).  He further contends, citing § 404.1574(a)(1), that it was improper for the ALJ to use the unsuccessful work attempt as a reason for discrediting Dr. Luft's opinions.  McCormick is half-right.  His short stint as a welder was an "unsuccessful work attempt" as defined in the regulation.  The ALJ made this finding.  AR 14. However, the regulation simply states that an unsuccessful work attempt "will not show that you are able to do substantial gainful activity."  20 C.F.R. 404.1574(a)(1).  It does not state that evidence of the work attempt is completely off-limits at every step of the disability analysis.  McCormick cites no authority for the proposition that it was improper for the ALJ to consider the circumstances of his employment as a welder when evaluating Dr. Luft's opinions.

This does not mean, however, that the unsuccessful work attempt, by itself, constitutes substantial evidence supporting the ALJ's decision to give little or no weight to those opinions. McCormick testified that he left the welder position "because [he] couldn't handle the stress, physical stress." AR 39. This explanation is not in dispute. Indeed, the ALJ found that the position was more demanding than McCormick's RFC would allow and that he left the position because of his impairments. AR 14, 21. The fact that McCormick tried to work, but ultimately was unable to do so, does not necessarily contradict Dr. Luft's opinions.

If the ALJ had provided other good reasons for discounting those opinions, the unsuccessful work attempt could be considered as another factor supporting her conclusion. As discussed above, however, the ALJ's other stated reasons are deeply flawed. The Commissioner's regulations require that a treating source's medical opinions be given controlling weight unless the ALJ makes certain findings. 20 C.F.R. § 404.1527(d)(2). If the ALJ makes those findings, then he or she must apply various factors, as specified in the regulations, to determine the appropriate weight. *Id.* Here, the ALJ crossed the wide gamut from controlling weight to, basically, no weight, with very little analysis and in reliance on incorrect interpretations of the medical evidence.

Giving no weight, or almost no weight, to a treating source's medical opinions is a big deal. It is certainly not unprecedented and, indeed, is perfectly appropriate when circumstances warrant. But devaluing a treating source's medical opinions to such a great extent requires a far better, and more accurate, explanation than what the ALJ provided in this case. The ALJ's limited explanation simply does not withstand scrutiny. I find that substantial evidence does not support the ALJ's decision to give little or no weight to Dr. Luft's opinions. I further find that the appropriate remedy is remand. On remand, the ALJ shall conduct a new analysis of Dr. Luft's medical opinions. If the ALJ finds that those opinions are not entitled to controlling weight, she

must both (a) explain why and (b) conduct the required analysis of the appropriate factors to determine the appropriate weight to give the opinions. And, of course, she must provide "good reasons" for her conclusion.

## 2. Dr. Agboro-Idahosa's Opinions

McCormick acknowledges that Dr. Agboro-Idahosa was not a treating source when she submitted opinions in the form of a mental capacities evaluation, as she did not have an "ongoing treatment relationship" with McCormick at that time. Doc. No. 9 at 15 n.4. Dr. Agboro-Idahosa completed the one-page, checklist evaluation on January 27, 2010, having examined McCormick one time. AR 19, 294. Because she was not a treating source, there is no presumption that her opinions are entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). Instead, the ALJ was required to consider the factors set forth in § 404.1527 in determining the weight to give those opinions. 20 C.F.R. § 404.1527(d).

Here, Dr. Agboro-Idahosa diagnosed McCormick with major depressive disorder, found that he would have extreme difficulties in maintaining social functioning, that he would have marked difficulties in maintaining concentration, persistence or pace, and that he would have moderate episodes of decompensation. AR 294. While the ALJ made several comments indicating that she did not find these opinions to be worthy of great weight, she nonetheless incorporated some corresponding limitations when determining McCormick's RFC. AR 17, 19-21. Specifically, the ALJ found that McCormick could only perform repetitive, unskilled work that did not require periods of extended concentration or attention. AR 17.

McCormick argues that the ALJ's criticisms of Dr. Agboro-Idahosa's opinions are unfounded and that, therefore, more weight should have been afforded to them. For example, in response to the fact that Dr. Agboro-Idahosa saw McCormick only one time

before issuing her opinions, he contends that Dr. Agboro-Idahosa was part of his "treatment team," meaning her opinions are entitled to greater weight. In support of this argument, McCormick cites *Shontos v. Barnhart,* 328 F.3d 418 (8th Cir. 2003), and notes that Dr. Agboro-Idahosa had access to a prior "crisis assessment" document prepared by a social worker on January 6, 2010.

Based on the record, it is hard to imagine how this case could be more distinguishable from *Shontos*. In *Shontos*, the plaintiff had been seen repeatedly by different mental health professionals within the same clinic over a period of fifteen months. 328 F.3d at 426. The professionals included therapists, a social worker and a psychiatrist. *Id.* One of the therapists saw her forty-nine times over that fifteen-month period. *Id.* Under these facts, the Eighth Circuit found that the group of professionals, as a team, were treating sources whose opinions were entitled to more weight than afforded by the ALJ in that case. *Id.* at 426-27.

By rather sharp contrast, the record here shows that as of January 27, 2010, the date of Dr. Agboro-Idahosa's opinion, McCormick had been seen once by her and once by a social worker. AR 294, 297-98, 301-03. While there were subsequent visits, McCormick's attempt to bolster Dr. Agboro-Idahosa's opinion with a "treatment team" argument is absurd.

McCormick also complains that the ALJ gave more weight to the opinion of Dr. Quinn, a state agency consultative psychologist who did not examine him, than to Dr. Agboro-Idahosa's opinion. McCormick argues that it was reversible error for the ALJ to discredit Dr. Agboro-Idahosa for issuing an opinion based on one examination while giving more weight to a consultative opinion issued after no examination.

If the ALJ had relied only on the number of examinations to weigh the medical opinions, then favoring the opinion of a consultative psychologist who never saw McCormick would be hard to justify. In fact, however, the ALJ gave other reasons for

discrediting Dr. Agboro-Idahosa's opinions. In particular, the ALJ found that those opinions are unsupported by other substantial medical evidence. AR 19. For example, while Dr. Agboro-Idahosa stated that McCormick would have "extreme" difficulties in maintaining social functioning, McCormick testified that social interactions are not a problem for him. AR 53, 294.

Likewise, despite reporting that McCormick had various "extreme" or "marked" limitations due to his mental impairment, Dr. Agboro-Idahosa noted that he had never before been seen by a psychiatrist. AR 301. Her treatment notes from follow-up, post-opinion visits also suggest that McCormick's condition was not as severe as her initial opinion indicated. For example, on February 10, 2010, Dr. Agboro-Idahosa found McCormick to be "a lot better than" when she first saw him, two weeks earlier. AR 307. She assigned a GAF score of 55, denoting only moderate symptoms.[6] AR 308. Moreover, McCormick's other treatment records reflect mental health examinations with normal findings, including a pleasant mood, logical and goal directed thought processes, and intact memory and insight. AR 297-98, 302, 304, 311, 314, 346, 425, 428.

As for McCormick's comparison of Dr. Agboro-Idahosa and the consultative psychiatrist, Dr. Quinn, the Commissioner notes that while Dr. Agboro-Idahosa utilized a one-page checklist form with no narrative explanations of her findings, Dr. Quinn's opinions are based on his review of McCormick's records and are supported by a lengthy, narrative explanation. AR 381-83. Citing *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010), the Commissioner points out that it is perfectly acceptable for an

---

[6] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

ALJ to credit other medical opinions over those of a treating or examining physician if the other medical opinions are supported by better or more thorough medical evidence.

Here, I find that the ALJ offered good reasons for the respective weight she gave to the medical opinions of Dr. Agboro-Idahosa and Dr. Quinn. I further find that those reasons are supported by substantial evidence in the record. As such, on remand the ALJ is not required to reevaluate Dr. Agboro-Idahosa's opinions. However, if the ALJ's consideration of other issues on remand causes her to conclude that she should reanalyze the medical opinions concerning McCormick's mental impairments, she is free to do so.

### 3. *Alleged Failure to Develop the Record.*

McCormick next contends that the ALJ erred in failing to obtain further medical evidence concerning his work-related impairments. This argument raises the familiar conflict between the claimant's burden to provide evidence of disability and the ALJ's duty to develop the record. It is, in fact, the claimant's burden to provide evidence of disability. *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009); *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004) ("It is the claimant's burden to establish her RFC at step four."). At the same time, Social Security proceedings are inquisitorial, not adversarial, meaning the ALJ has a duty "to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). McCormick correctly notes that this duty includes "seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006).

The Commissioner's regulations attempt to reconcile these respective duties. For example, they provide that an ALJ is required to recontact a treating source or order a consultative examination if other evidence is not sufficient to reach a decision. 20

C.F.R. §§ 404.1520b(b), 404.1527(c). Here, I agree with the Commissioner that neither situation applies. Indeed, McCormick's argument is somewhat contradictory. Initially, he complains that Dr. Luft's opinions, along with those of Dr. Agboro-Idahosa, demonstrate that he is disabled and should have been awarded benefits. But because he does not like the way the ALJ *weighed* the medical opinions, he also argues that the medical evidence was insufficient to reach a decision, one way or the other.[7]

The ALJ was presented with conflicting medical opinions concerning the nature and extent of McCormick's impairments. I have already found that the ALJ failed to conduct an appropriate analysis of Dr. Luft's opinions. That does not mean, however, that the ALJ failed to fully develop the record. I reject McCormick's argument to the contrary. On remand, the ALJ will not be required to develop the record further. However, if she determines that further development is appropriate, she is free to do so.

### 4. *The RFC and the Hypothetical Question*.

McCormick next argues that even if the ALJ properly favored the opinions of Dr. Quinn, the non-examining psychological consultant, she failed to accurately incorporate those opinions into her RFC determination and her hypothetical question to the VE. McCormick notes that Dr. Quinn found "moderate" limitations in various areas, including, for example, the ability to understand, remember and carry out detailed instructions, the ability to maintain attention and concentration for extended periods and the ability to get along with coworkers and peers. AR 381-82. He contends that the ALJ disregarded some of those findings when determining McCormick's RFC and posing hypothetical questions.

---

[7] McCormick states, for example, that the ALJ was required to develop the record further if she "did not believe that the professional opinions available to [her] were sufficient to allow [her] to form an opinion." Doc. No. 9 at 18. There is no indication that the ALJ had such a belief.

The Commissioner disagrees. With regard to the RFC determination, the Commissioner states that by finding McCormick capable of doing only routine, repetitive and unskilled work with an SVP of 1 or 2,[8] and that requires no periods of extended concentration or attention, the ALJ incorporated nearly all of the limitations determined by Dr. Quinn. The Commissioner further notes that the ALJ rejected Dr. Quinn's finding concerning McCormick's ability to get along with others based on McCormick's own testimony that he has no problems with social interaction. AR 20, 53.

I agree with the Commissioner that the RFC, with its various limitations that include a SVP of just 1 or 2, appropriately accounts for the mental limitations that the ALJ found to be credible. Moreover, the ALJ included the same mental limitations in the hypothetical question to the VE. Specifically, the ALJ stated that the hypothetical individual would be limited to "unskilled work, routine, repetitive, SVP: 1 or 2, that doesn't require extended concentration or attention." AR 50-51. In response to the hypothetical (which also included physical limitations), the VE testified that the hypothetical person could perform several positions, including receptionist, production worker or cashier. AR 51. Because the hypothetical captured the essence of the mental limitations the ALJ found to be credible, it was not improper.

On remand, the ALJ will not be required to reformulate McCormick's RFC, or the substance of any hypothetical questions, with regard to McCormick's mental limitations. As suggested above, however, if the ALJ determines that modifications to the RFC and/or the hypothetical questions are appropriate, she is free to make those modifications.

---

[8] A position with an SVP of 1 requires a short demonstration only while an SVP of 2 requires vocational preparation of no more than one month. *See Dictionary of Occupational Titles*, Appendix C.

34

## 5.    *McCormick's Credibility.*

Finally, McCormick argues that the ALJ's analysis of his credibility was flawed and inadequate.   The standard for evaluating the credibility of a claimant's subjective complaints is set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).   The ALJ must consider the claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions.   *Polaski*, 739 F.2d at 1322.   The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant.   *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000).   The ALJ is not required to explicitly discuss each factor as long as he or she acknowledges and considers the factors before discrediting the claimant's subjective complaints.   *Goff*, 421 F.3d at 791.   "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints."   *Singh*, 222 F.3d at 452.   The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnart*, 393 F.3d 798, 801 (8th Cir. 2005).   The ALJ may not discount subjective complaints solely because they are not supported by objective medical evidence.   *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008); *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003).

Here, the ALJ found that McCormick's statements about his symptoms were not fully credible.   AR 18.   According to the Commissioner, if the ALJ's decision is read carefully, three reasons emerge for this finding:   (a) the lack of objective medical findings, (b) minimal or sporadic treatment and (c) McCormick's daily activities, especially a period of work as a welder.   Doc. No. 10 at 16.   There is no doubt that the ALJ relied heavily on the apparent lack of objective findings that could explain McCormick's allegations of disabling pain.   The ALJ stated that McCormick's

most-recent MRI scan was largely normal and examinations have revealed no other physical condition that could cause the claimed level of pain. AR 18-20.

I agree with McCormick that the ALJ's analysis of his credibility was flawed. For the reasons discussed earlier with regard to Dr. Luft's opinions, the ALJ was simply wrong in concluding that there is no objective medical evidence corroborating McCormick's complaints of pain. The ALJ found that McCormick suffers from fibromyalgia and that it is a severe impairment. AR 14. The trigger-point test findings that led to this diagnosis are "objective evidence of the disease." *Chronister*, 442 F.3d at 656. The lack of traditional objective findings, such as positive indications on an MRI scan, is not unusual with regard to fibromyalgia. *Sarchet*, 78 F.3d at 307.

Because the ALJ's credibility analysis appears to have been heavily influenced by the perceived lack of objective medical evidence, on remand the ALJ shall revisit the issue of McCormick's credibility under *Polaski*. The ALJ shall take into account the fact that fibromyalgia is a rheumatic disease and shall analyze the medical evidence in accordance with Eighth Circuit law concerning that disease, as discussed herein.

### *Conclusion and Recommendation*

For the reasons discussed above, I **RESPECTFULLY RECOMMEND** that the Commissioner's decision be **reversed** and this case be **remanded** for further proceedings consistent with this report. Judgment should be entered in favor of McCormick and against the Commissioner.

On remand, and as described more completely above, the ALJ should:

1) Conduct a new analysis of Dr. Luft's opinions in accordance with the standards described in 20 C.F.R. § 404.1527. If the ALJ determines that those opinions are not entitled to controlling weight, the ALJ shall fully explain the reasons for that determination and shall then apply the

appropriate factors and provide good reasons for the weight the ALJ gives to those opinions.

2) Conduct a new analysis of McCormick's credibility using the *Polaski* factors, taking into consideration the Eighth Circuit's guidance concerning the severe impairment of fibromyalgia.

Based on the outcome of these new analyses, the ALJ shall determine if it is necessary to revisit and/or modify other aspects of the ALJ's prior decision, including but not limited to the ALJ's findings with regard to McCormick's RFC and, of course, the ultimate decision as to whether McCormick is disabled within the meaning of the Act.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 26th day of July, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE